## Case No. 621.

### The ATLANTIC.

### [1 Ware, 121.]¹

### District Court, D. Maine. 1827.

SHIPPING — PUBLIC REGULATIONS — COASTING LICENSE—FOREIGN VOYAGE—ACT MARCH 1, 1823.

1. A vessel under a coasting license is not subject to forfeiture for a voyage from an American port to Calais, and delivering her cargo to a British merchant, while lying in the stream, on the American side of the jurisdictional line.

2. This is not a foreign voyage, the delivery of the cargo being within the American waters, though it is delivered to a British subject residing on the British side of the stream.
[See The Lark, Case No. 8,090; The Three Brothers, Id. 14,009.]

3. The waters of the river Schoodiac and of the bay of Passamaquoddy, separating the United States from the British province of New Brunswick, are common to both parties for the purposes of navigation.

4. The act of 1823, [3 Stat. 740, c. 22,] c. 21, entitled "An act to regulate the commercial intercourse between the United States and certain British colonial ports," does not render unlawful the exportation of American produce in American vessels to any of the ports of the British North American provinces not enumerated as open ports in that act.

In admiralty. December term, 1827.—This was a vessel seized by the collector of the

¹ [Reported by Hon. Ashur Ware, District Judge.]

customs for the district of Passamaquoddy, for an alleged violation of the revenue and navigation laws. The libel contained three allegations of forfeiture. 1st. That she was a vessel licensed for carrying on the coasting trade, and was engaged in another trade than that for which she was licensed. 2d. That she proceeded on a foreign voyage, without first giving up her license and taking out a register. 3d. That · the merchandise was shipped and water-borne for the purpose of being exported to the port of St. Stephens, in the province of New Brunswick, in violation of the act of March 1, 1823, entitled "An act to regulate the commercial intercourse between the United States and certain British colonial ports," mentioned in the act, [3 Stat. 740.] The material facts proved at the hearing were, that the Atlantic sailed from the port of Bath, under a coasting license, with a cargo of hay, corn, &c., previously bargained for by Mr. Jones, a British merchant resident at St. Stephens, a place lying on the river Schoodiac, opposite to Calais, with written orders, which were produced on her arrival, to deliver her cargo, "along-side," while she should be lying in the stream. There was some evidence introduced, tending to show that she came to anchor and discharged part of her cargo while lying on the British side. But this was met by contradictory testimony on the part of [Swan and others,] claimants, and was abandoned at the argument by the district attorney. While lying at anchor in American waters, as the proof was, several bundles of hay were discharged into a flat-bottomed boat, or gondola, part of which were carried to a British vessel lying in the stream, and part to the shore in St. Stephens. The captain, who was released and examined as a witness, stated that the boats did not belong to the vessel, and were not employed by him, but by Jones, and that the delivery of the cargo into them was a delivery to the purchaser, and discharged the owners from all further responsibility.

Shepley, U. S. Dist. Atty.
Allen & Sprague, for claimants.

WARE, District Judge. Upon the facts which have been proved in the case, the counsel for the libellants has argued that the vessel and cargo are forfeited under the 8th section of the act of February 18, 1793, commonly called the coasting act,—2 U. S. Laws, c. 153, [1 Stat. 308,]—for proceeding on a foreign voyage without first giving up her license and taking out a register. The ostensible voyage was strictly one of coasting from Bath to Calais. In making such a voyage, a vessel with a coasting license is not rendered liable to forfeiture by merely passing out of the jurisdiction of the United States into that of an adjoining power. The waters of the bay of Passamaquoddy and the river Schoodiac, separating the United

States from the British provinces, are, upon the principles of public law, common to both powers for the purposes of navigation. The Fame, [Case No. 4,634;] The Apollon, 9 Wheat. [22 U. S.] 362. The mere fact, therefore, of her transit through British waters in the performance of the voyage, will not work a forfeiture, and it is not contended upon the evidence that she discharged her cargo while lying beyond the jurisdictional line of this country. But it is argued that though she was discharged while lying in American waters, yet if the cargo was taken in boats belonging to the vessel, and carried to the British side, or in boats employed by the master, this would, on a sound construction of the law, be a foreign voyage, as much as if she actually discharged her cargo at the wharf in a foreign port, the termination being that which fixes the character of the voyage, and determines whether it be a foreign or coasting voyage. The argument would certainly be entitled to great consideration, upon a different state of facts. But the testimony of the master on this point is clear and uncontradicted. He states explicitly that the cargo was delivered to Jones, along-side the vessel, into boats provided by him, and that the goods were at his risk from the moment that they were in the boat; and the facts as he states them are in conformity with his written instructions. There is nothing in the case to bring his statement into doubt. The true question on the facts is, whether this delivery of the cargo to a British merchant, within the waters of the United States, rendered this enterprise a foreign voyage, within the meaning of the law. I am clear in the opinion that it did not. The whole voyage, from its commencement to its termination, was within the jurisdiction of the United States, nor can I see how this section of the law is any more violated by the delivery of the cargo in the harbor of Calais, than it would be by a delivery on the wharf. It is then contended that the vessel and cargo are forfeited under the 32d section of this law, for being engaged in a trade other than that for which she was licensed. It is argued that the voyage was in violation of the act of congress of [March 1,] 1823, [3 Stat. 740,] c. 21, entitled "An act to regulate the commercial intercourse between the United States and certain British colonial ports." If the voyage was illegal, a forfeiture will undoubtedly follow from this section of the coasting act which prohibits all trade but that for which she was specially licensed; and if it had not already been settled by adjudicated cases, it is too clear to admit of a question, that the license cannot be extended to protect a traffic prohibited by law. The Eliza, [Case No. 4,346;] The Resolution, [Id. 11,-709.]

The third allegation of the libel is founded on the 8th section of this act, and alleges that the cargo was shipped and water-borne for the purpose of being exported to the port of St. Stephens, in violation of this act. This offence is visited by a forfeiture of the goods only; but if the voyage were illegal, as the forfeiture of the vessel would follow from the 32d section of the coasting act, by the operation of the two laws the forfeiture will extend to both the vessel and cargo. It is this point which has been most elaborately argued at the bar. The cargo was sold to a British merchant at St. Stephens, to be delivered at Calais, while the Atlantic was lying in the stream. A part, after being discharged from the Atlantic, was actually carried to St. Stephens in British boats, and part put on board a British vessel lying in the stream. None was landed at Calais. It is contended that it was originally shipped and water-borne for the purpose of being carried to St. Stephens in British bottoms; and further that the voyage was, under the operation of the act of 1823, illegal, whether the conveyance was in British or in American vessels, and that by the true construction of that act, all intercourse with the non-enumerated British colonial ports is interdicted. Two questions may be raised on this argument. First, whether such be the true construction of the act; secondly, if it is, whether the whole act is not abrogated by the president's proclamation of March 17, 1827. The first section of the act suspends the navigation act of April 18, 1818, [3 Stat. 432,] and the supplementary act of May 15, 1820, [3 Stat. 602,] as to the ports enumerated in the act. The second and third sections regulate the importations from these ports in British vessels. The fifth, which is the section relied upon, provides, "That it shall be lawful to export from the United States directly to any of the above enumerated British colonial ports, in any vessel of the United States, or in any British vessel, navigated as by the second section of this act is provided, &c., any article of the growth, produce, and manufacture of the United States, or any other article legally imported therein, the exportation of which elsewhere shall not be prohibited by law." The argument is, that this is an implied prohibition of exporting to any other than one of the enumerated ports, either in British or American bottoms; that it was the policy of the act to confine the intercourse entirely to those ports, and establish a non-intercourse with all the other ports. If such were not the intention, it is asked, why were the words "vessels of the United States" used? I cannot assent to the correctness of this argument. It is well known as an historical fact, that our government has always sought a free and unrestrained commercial intercourse with all parts of the world. Its policy always has been to extend the trade of the country to its utmost limits in every direction. No stronger proof could be given of it than the act of 1815,—4 U. S. Laws, p. 824, [Bi. & D. Laws, 3 Stat. 224,]—

which abolishes all discriminating duties against foreign vessels of any nation which has no such discriminating duties against vessels of this country. They are at once admitted to all the privileges of American vessels in the direct intercourse with this country, as soon as our vessels are put on the same footing with respect to privileges, as theirs, in their ports. Such are the terms of the treaty regulating the intercourse between this country and the European ports of the British empire. The only condition required by our laws, to give to our trade with any foreign nation its utmost extent and activity, is, that such nation shall extend to the navigating interests of this country the same advantages which we offer to theirs. If British vessels are prohibited from coming to an entry in our ports, when arriving from any of their colonial ports, it is only because our vessels are prohibited by their navigation laws from engaging in trade at the same ports. The 7th section of this act offers to every other colonial port all the privileges of the act as soon as their ports shall be opened to American vessels on the same terms as the ports enumerated in the act are. To suppose, then, that this act prohibits a trade to the non-enumerated colonial ports, in American vessels, would be to give a construction in direct hostility to the whole policy of the country in relation to its commerce and navigation. If the intention of the legislature were such as is contended, why are not American vessels required to give a bond, analogous to that required of British vessels, to land their cargoes in some of the specified ports. Yet American vessels are nowhere named in the proviso, though it contains the penal clause on which this allegation of the libel is founded. Whatever may have been the object of introducing the words "vessels of the United States" in the enacting clause of the section, it would be a bold construction to hold that the effect is to interdict, by implication, a trade which was before lawful, even if the statute contained nothing to repel such a construction. But it is not so. The disabling and penal clause in this section clearly negatives the construction contended for by the libellants. The words are, "It shall not be lawful to export from the United States any article whatsoever, to any of the above enumerated British colonial ports in any British vessel, other than such as shall have come directly from one of the said ports to the United States; nor shall it be lawful to export from the United States any article whatsoever, in any British vessel having come from one of the said enumerated ports, to any other port or place whatsoever than directly to one of said ports. And in case any such article shall be shipped or waterborne for the purpose of being exported, contrary to this act, the same shall be forfeited," &c. Here we have both the interdict and the penalty, and this is the only

part of the act which regulates the export trade. And what is prohibited by this clause? It is a shipment for the purpose of exportation to some of the enumerated ports in a British vessel which did not arrive from one of them; or a shipment in a British vessel arriving from one of these ports for a non-enumerated port. I see no other case in which the forfeiture would attach. But if the intention was what is supposed by the argument, the words "vessels of the United States" would have appeared in this clause.

It is further contended that the original purpose of this enterprise was a transportation of the cargo from Bath to Calais, to be there transhipped and conveyed in British bottoms to St. Stephens. As these two places lie on opposite sides of the river, it is manifest that for all purposes of navigation a voyage to Calais is a voyage to St. Stephens. The object of this law being to secure to our shipping a fair proportion of the carrying trade, if the termination of this voyage is that which is alleged, this would be no violation of the spirit and intention of the act, even if it were of its letter. If it were necessary to decide this point, it would be difficult to maintain that the mere discharge of a cargo into boats, while the vessel was lying in waters common for many purposes to both parties, for the purposes of landing it, was, in any proper sense of the word a transhipment. It is, however, unnecessary for me to decide on these facts. My opinion is that the whole law is repealed and suspended by the president's proclamation. The sixth section provides that if at any time any of the ports named in the act should be closed against American vessels, "proclamation to that effect having been made by the president, each and every provision of this act, so far as the same apply to the intercourse between the United States and the above enumerated British colonial ports in British vessels, shall cease to operate in their favor;" and that the acts of 1818 and 1820 should revive and be in full force. The fact contemplated in this section having happened, the president issued his proclamation on the 17th of March last, to that effect; the consequence of which was, that this act, from that time, ceased to operate in favor of British vessels, and the two other acts were restored to their full force. When this part of the act is erased, what is there remaining? The act was not necessary to render the trade in American vessels lawful; that was lawful before, and continues to be so after the repeal. The whole operation of the statute was to open our ports to British vessels, under such regulations as are prescribed. When the whole act is repealed, so far as it grants this liberty, or regulates it, the penalty necessarily falls with it; for nothing remains on which it can act. There can be no violation of an act which is extinct. It would be extravagant to suppose

that the penalty is kept alive when the act is dead. It is not pretended that the vessel here violated any of the provisions of the two acts revived by the proclamation. I therefore decree her to be restored to the claimants.